### In re HEALTH MANAGEMENT, INC. SECURITIES LITIGATION.

No. CV 96–889 (ADS).

United States District Court, E.D. New York.

July 21, 1997.

Kaplan, Kilsheimer & Fox, L.L.P. by Frederic S. Fox, Richard J. Kilsheimer, Joel B. Strauss, New York City; Zwerling, Schacter & Zwerling, L.L.P. by Jeffrey C. Zwerling, New York City, for Plaintiffs.

Edwards & Angell, New York City, for Defendant BDO Seidman, L.L.P.; Ira Greenberg, Mark J. Goldberg, of counsel.

Reed, Smith, Shaw & McClay, Pittsburgh, PA, for Defendants Irwin Hirsch, Lloyd N. Myers; W. Thomas McGough, Jr., Theresa C. Williams–Harris, Richard J. DeMarco, Jr., of counsel.

Matthew S. Dontzin, New York City, for Defendant Clifford E. Hotte; Edward Wolf, of counsel.

Poli & Lamura, Northport, NY, for Defendant Virginia Belloise; John G. Poli, Barry J. Casper, Lawrence Kushnick, of counsel.

### MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

This action arises from a consolidated amended complaint (the "complaint") by the plaintiffs on behalf of all persons who purchased the common stock of Health Management, Inc. ("Health Management") from August 25, 1994 through February 26, 1996 (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) ("Section 10(b)" and "Section 20(a)", respectively), and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"), against Health Management, certain of its officers and/or directors-specifically, Irwin Hirsch ("Hirsh"), Lloyd N. Myers ("Myers"), Clifford E. Hotte ("Hotte"), Drew W. Bergman ("Bergman"), and Virginia Belloise ("Belloise") (collectively, the "Individual Defendants"), and its outside auditor, BDO Seidman, LLP ("BDO").

By a Final Judgment and Order of Partial Dismissal of Action dated June 9, 1997, this action was dismissed as to Health Management. Presently before the Court are: (1) BDO's motion pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss for failure to state a claim upon which relief can be granted; (2) Hotte's motion pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss for failure to state a claim upon which relief can be granted; (3) Belloise's motion pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss for failure to state a claim upon which relief can be granted; and (4) Hirsh and Myers' motion pursuant to Fed.R.Civ.P. 12(e) and 9(b), for a more definitive statement.

## I. BACKGROUND

### A. Health Management

According to the eighty-nine page complaint, the defendant Health Management is engaged in the business of providing integrated health management services to individuals suffering from chronic medical conditions, and to various health care professionals, drug manufacturers, and third-party payers involved in the care of such patients. Health Management has purportedly grown rapidly since its shift in 1989 from the general home healthcare market to the specialized field of chronic disease management. The plaintiffs allege that converting increasing revenues and earnings to cash proved to be a daunting task for Health Management and as a result, prior to the commencement of the Class Period, Health Management began to experience increasing difficulty collecting payment for its enhanced services, which resulted in ballooning accounts receivable and days sales outstanding ("DSO"), the average number of days that a receivable remains outstanding prior to collection. Faced with these pressing concerns, Health Management embarked upon an aggressive acquisition strategy designed to improve Health Management's balance sheet by acquiring complimentary companies with lower DSO levels in order to generate cash flow. The plaintiffs allege that because Health Management lacked resources to acquire these businesses, it was forced to use its common stock to fund many of these acquisitions. Health Management soon recognized that its acquisition strategy would fail unless it was able to support the value of its stock.

In addition, Health Management had certain loans from Chemical Bank under which disappointing earnings report falling below prevailing analyst expectations would place Health Management in default.

## B. *The defendants*

The cast of characters in the alleged fraudulent scheme include the Individual Defendants and BDO, Health Management's outside auditor. Set forth in the complaint is each defendant's relationship to Health Management, which are as follows.

Hotte, the founder of Health Management in 1986, was the President and Chairman of the Board of Directors of Health Management. He was the second largest shareholder of Health Management. As of September 20, 1995, Hotte owned or controlled in excess of 1.1 million shares of Health Management common stock, which is approximately 11.4% of the outstanding common stock, including shares held in the name of his wife, codefendant Belloise, and shares subject to exercisable options. Hotte is alleged to have signed: (1) Health Management's Form 10-Q for the first three quarters of Fiscal 1995; (2) the statement in the letter to shareholders dated December 18, 1994; (3) the statement contained in the 1995 Form 10-K; (4) the statement contained in Health Management's letter to shareholders dated August 5, 1995; and (5) Health Management's Form 10-Q for the first two quarters of Fiscal 1996.

Belloise was a member of Health Management's Board of Directors and also served as its Secretary from March 1988 to December 1993. Belloise is alleged to have signed the 1995 Form 10-K.

Bergman was Corporate Development Officer, Treasurer and Secretary of Health Management, as well as a member of Health Management's Board of Directors. From approximately June 1995 through December 21, 1995, Bergman served as Chief Financial Officer and Principal Accounting Officer of Health Management. As of September 20, 1995, Bergman owned or controlled 25,667 shares of Health Management common stock, including shares subject to exercisable options. Bergman is alleged to have signed:

(1) Health Management's Form 10-Q for the first three quarters of Fiscal 1995; (2) the statement contained in the 1995 Form 10-K; and (3) Health Management's Form 10-Q for the first two quarters of Fiscal 1996.

Myers served as Vice President and principal of both Murray Pharmacy, Inc., and Murray Pharmacy Too, Inc. (collectively, the "Murray Group"). On or about April 1, 1994, Health Management acquired substantially all of the net assets of the Murray Group. By virtue of this transaction, and subsequent to July 24, 1995, Myers became Vice President for Sales and Marketing of Health Management. In addition, since March 1994, Myers served as Vice President for Program Development of Health Management's wholly owned subsidiary, HMI Pennsylvania. Further, as a result of the acquisition, by September 20, 1995, Myers owned or controlled over 3.3% of Health Management's outstanding common stock.

Hirsh served with Myers as principal of the Murray Group. After Health Management's acquisition of the Murray Group, Hirsh became Vice President for Purchasing and Managed Care Contracts of HMI Pennsylvania. In addition, by September 20, 1995, Hirsh exercised control or ownership of more than approximately 3.3% of Health Management's outstanding common stock.

The complaint alleges that the individual defendants engaged in the following culpable conduct:

> Each of the defendants ... reviewed or was aware of the materially false and misleading SEC filings, press releases, and other statements complained of herein at or about the time they were issued or circulated, knew or recklessly disregarded their materially false and misleading nature, and were in a position to control or influence their contents or otherwise cause corrective or accurate disclosures to have been made. Defendants engaged in the common course of conduct complained of herein from at least August 25, 1994—the day that the Company announced its earnings for the first quarter of Fiscal 1995— the purpose of which was to artificially inflate the market price of Health Manage-

ment common stock, through the issuance of materially false and misleading statements to the public, all as particularized herein.

Complaint ¶ 11.

In addition, the complaint alleges that the individual defendants were "controlling" persons of Health Management within the meaning of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a),

by reason of their management positions in Health Management, their membership on the Company's Board, their extensive equity interest in the Company, and/or their direct and necessary participation in the fraudulent acts alleged herein. Because of their positions in the company, and/or their stock ownership, the Individual Defendants had the power and influence to Cause Health Management to engage in the unlawful acts and conduct alleged herein. The Individual Defendants participated in this wrongful conduct to inflate the price of the Company's common stock and to conceal the adverse facts concerning the Company's business and financial condition, so that they could (i) enhance the value of their extensive Health Management securities holdings; (ii) allow the Company to conclude various acquisitions by using the inflated value of its stock as merger consideration; and (iii) obtain financing on behalf of the Company to pursue various business acquisitions.

Complaint ¶ 12.

Finally, BDO is an accounting firm with its principal office located in New York, New York, and a regional office located in Mitchel Field, New York. Commencing as early as April 30, 1989, BDO served as Health Management's auditor. The plaintiffs allege that BDO issued an opinion included in Health Management's Form 10–K for Fiscal 1995, certifying that it had audited Health Management's financial statements in accordance with generally accepted auditing standards ("GAAS"). In addition, the plaintiffs allege that Bergman's wife was the Office Manager and Marketing Coordinator for BDO Seidman's Mitchel Field office.

## C. *The alleged fraudulent scheme*

The complaint sets forth the plaintiffs' claims under the federal securities laws for materially false and misleading statements and omissions disseminated by the individual defendants during the Class Period. These alleged materially false and misleading statements caused the price of Health Management common stock to be artificially inflated during the Class Period, allowing Health Management to complete a number of business acquisitions and for the individual defendants to profit from the artificially inflated value of their personal holdings of Health Management common stock.

Specifically, the Individual Defendants are alleged to have performed the following acts, among others, to artificially inflate Health Management's financial reports:

1) the inclusion of severely delinquent, uncollectible and, in some cases, fictitious accounts receivables on Health Management's financial statements throughout the Class Period;

2) the inclusion of fictitious "in-transit" inventory on Health Management's balance sheet for its fiscal year ending April 30, 1995 ("Fiscal 1995"), thereby inflating Health Management's Fiscal 1995 earnings by decreasing its cost of goods sold during the applicable reporting period;

3) the inclusion of inventory on Health Management's balance sheet for the second fiscal quarter of the fiscal year ending April 30, 1996 ("Fiscal 1996"), for which invoices were received but not recorded as accrued payables until after the applicable reporting period, which inflated Health Management's earning's by decreasing its cost of goods sold during the applicable reporting period; and

4) the inclusion of cash received after the end of Fiscal 1995 and the first two quarters of Fiscal 1996, as if these sums had been received during the applicable reporting periods, thereby artificially inflating Health Management's cash balances and artificially decreasing levels of DSO.

Allegedly, BDO participated in the fraud by overstating Health Management's finan-

cial condition in its Form 10–K for the 1995 fiscal year.

The alleged fraudulent scheme, according to the complaint, continued through the first two quarters of Fiscal 1996, during which time the net income was overstated by more than 116%. The investment community reacted positively to these optimistic financial results. However, the alleged fraudulent scheme began to unravel on February 23, 1996 when Health Management announced that it had "discovered certain accounting irregularities" and that a restatement was possible. By March 1996, BDO withdrew its opinion of Health Management's financial results for Fiscal 1995. Consequently, Health Management restated its results for each quarter of Fiscal 1995 and the first two quarters of Fiscal 1996.

## II. DISCUSSION

### A. Fed.R.Civ.P. 12(b)(6) standard

On a motion to dismiss for failure to state a claim, "the court should not dismiss the complaint pursuant to Rule 12(b)(6) unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief'". *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985)(quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); *see also IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052–53 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994). The Second Circuit stated that in deciding a Rule 12(b)(6) motion, a court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993); *see also Paulemon v. Tobin,* 30 F.3d 307, 308–09 (2d Cir.1994); *Rent Stabilization Ass'n of the City of New York v. Dinkins,* 5 F.3d 591, 593–94 (2d Cir.1993) (citing *Samuels,* 992 F.2d at 15).

It is not the Court's function to weigh the evidence that might be presented at a trial; the Court must merely determine whether the complaint itself is legally sufficient, *see*

*Goldman,* 754 F.2d at 1067, and in doing so, it is well settled that the Court must accept the allegations of the complaint as true, *see Leeds v. Meltz,* 85 F.3d 51 (2d Cir.1996); *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10, 14 (2d Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990), and construe all reasonable inferences in favor of the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Leeds, supra,* 85 F.3d at 51; *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1099 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).

The Court is mindful that under the modern rules of pleading, a plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief", Fed.R.Civ.P. 8(a)(2), and that "[a]ll pleadings shall be so construed as to do substantial justice," Fed.R.Civ.P. 8(f).

The issue before the Court on a Rule 12(b)(6) motion "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claim." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (citing *Scheuer, supra,* 416 U.S. at 235–36, 94 S.Ct. at 1686). Recovery may appear remote and unlikely on the face of the pleading, but that is not the test for dismissal under Rule 12(b)(6). *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citing *Scheuer, supra,* 416 U.S. at 236, 94 S.Ct. at 1686).

It is within this framework that the Court addresses the present motions to dismiss.

### B. Pleading scienter pursuant to the Private Securities Litigation Reform Act

BDO, Hotte and Belloise maintain that the plaintiffs have failed to satisfy the heightened pleading requirement for securities fraud actions prescribed by the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 15 U.S.C. § 78u–4 (the "PSLRA"), which amended the Securities Exchange Acts of 1933 and 1934. Specifically, BDO maintains that the "motive and opportunity" test adopted by the Second Cir-

cuit for pleading scienter, the mental state required for securities fraud liability, has been abrogated by the PSLRA. In addition, BDO and Hotte argue that recklessness no longer suffices to plead scienter. For the reasons that follow, the Court finds these arguments unpersuasive.

Prior to the passage of the PSLRA, the courts of appeals have interpreted the pleading standards under Fed.R.Civ.P. 9(b) in conflicting ways. For example, prior to the enactment of the PSLRA, the Second Circuit established the following test for pleading scienter in Rule 10(b) cases:

> The requisite "strong inference" of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 813 (2d Cir.1996); Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir.1995); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994). However, the Ninth Circuit rejected the Second Circuit's "strong inference" test and concluded that scienter may be averred generally, without requiring identification of facts giving rise to an inference of scienter. See In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1546–47 (9th Cir.1994).

Congress saw a need to "establish uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits." H.R. Conf. Rep. No. 104–369, at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 740. Hence, with the enactment of the PSLRA, the requisite state of mind in securities fraud actions is as follows:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). In this regard, Congress was influenced by the pleading standard of the Second Circuit in adopting the above pleading requirement:

> The Conference Committee language is based in part on the pleading standard of the Second Circuit. The standard also is specifically written to conform the language to Rule 9(b)'s notion of pleading with "particularity."

H. Conf. Rep. 104–369 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 740. However, the PSLRA does not delineate what facts suffice to establish a "strong inference" of fraudulent intent. Instead, Congress, in its infinite wisdom, bestowed such duty to interpret upon the courts.

Although Congress intended to eliminate the disparity in pleading standards among the courts, the interpretation of the "strong inference" standard enunciated under the PSLRA has been the source of debate among some courts. The source of this dissension stems from whether pleading facts supporting an inference of recklessness or motive and opportunity are sufficient to satisfy the "strong inference" standard under the PSLRA.

Several courts have held that only circumstantial evidence of conscious behavior by a defendant suffices to satisfy the pleading requirement of the PSLRA. See In re Silicon Graphics, Inc. Securities Litig., Fed.Sec. L.Rep. (CCH) ¶ 99,325, 1996 WL 664639 (N.D.Cal. Sept.25, 1996); Friedberg v. Discreet Logic Inc., 959 F.Supp. 42, 49 (D.Mass. 1997); Norwood Venture Corp. v. Converse Inc., 959 F.Supp. 205, 208 (S.D.N.Y.1997). However, other courts have adopted the Second Circuit's test for pleading a "strong inference" of fraudulent intent. See Page v. Derrickson, No. 96–842–CIV–T–17C, 1997 WL 148558, at *10 (M.D.Fla. March 25, 1997); Fugman v. Aprogenex, Inc., 961 F.Supp. 1190, 1195 (N.D.Ill.1997); Shahzad v. Meyers, No. 95 Civ. 6196, 1997 WL 47817, at *7 n. 6 (S.D.N.Y. Feb.6, 1997); Rehm v. Eagle Finance Corp., 954 F.Supp. 1246, 1252–53 (N.D.Ill.1997); Fischler v. AmSouth Bancorporation, No. 96–1567–CIV–T–17A, 1996 WL 686565, at *2–3 (M.D.Fla. Nov.14,

1996); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.*, 941 F.Supp. 1369, 1377 (S.D.N.Y.1996); *Zeid v. Kimberley*, 930 F.Supp. 431, 438 (N.D.Cal.1996); *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F.Supp. 1297, 1310 (C.D.Cal.1996).

The only courts within the Second Circuit to conduct analytical evaluations of the pleading requirement set forth in the PSLRA, are inapposite. *See Norwood Venture Corp., supra; In re Baesa Securities Litig.*, 969 F.Supp. 238 (S.D.N.Y. 1997).

In *Norwood Venture Corp., supra*, Judge Baer held that under the PSLRA, "a plaintiff must now plead specific facts that 'create a strong inference of knowing misrepresentation on the part of the defendants.'" *Norwood Venture Corp.*, 959 F.Supp. at 208 (quoting *In re Silicon Graphics, Inc. Securities Litig.*, 1996 WL 664639, at *7 (N.D.Cal. Sept.25, 1996)). Judge Baer based his conclusion upon an examination of the legislative history, noting that in passing the PSLRA, Congress sought to "strengthen the pleading requirements," and that "it [did] not intend to codify the Second Circuit's case law interpreting this pleading standard." *Id.* (citation omitted). For this reason, the congressional conference committee "chose not to include in the pleading standard certain language relating to motive, opportunity or recklessness." *Id.* at 208 n. 5 (citation omitted). Judge Baer further noted that when President Clinton vetoed the PSLRA bill, which veto was overridden by Congress, he stated that Congress intended to heighten the pleading standard even beyond that adopted by the Second Circuit. *Id.* Although rejecting the motive and opportunity aspect of the Second Circuit standard under the PSLRA standard, Judge Baer did seek guidance interpreting the knowing misrepresentation standard from the Second Circuit's "conscious misbehavior" standard. *Id.*

In *In re Baesa Securities Litig., supra*, Judge Rakoff rejected the legislative history relied upon by Judge Baer in *Norwood Venture Corp., supra*, citing it as unnecessary and imprudent when the statutory language is clear and unambiguous, and held that the scienter requirement under the PSLRA does not require more than "recklessness." *Id.* 969 F.Supp. at 240–42. However, Judge Rakoff held that "motive and opportunity" no longer automatically suffice to plead the required "strong inference" of fraudulent intent given the plain language of the PSLRA. *Id.* at 242. Judge Rakoff further held that particulars regarding motive and opportunity may be contributing factors in determining whether the requisite scienter exists and motive and opportunity, by themselves, may suffice if a strong inference of fraudulent intent may be inferred from such allegations. *Id.*

This Court concurs with Judge Rakoff in *In re Baesa Securities Litig., supra*, that recklessness is sufficient to plead a strong inference of fraudulent intent under the PSLRA. However, the Court diverges with *In re Baesa Securities Litig.*, in that the Court believes that motive and opportunity, as this concept has been developed by the Second Circuit and the district courts thereunder, is sufficient to plead a strong inference of scienter under the PSLRA. The only requirement imposed by Congress pursuant to the PSLRA in pleading scienter is that a plaintiff plead facts giving rise to a "strong inference" of fraudulent intent. If the standard to be imposed by the PSLRA was to be one of "knowing misbehavior", Congress knew well how to state that standard. *See* 15 U.S.C. § 78u–5 (safe harbor provision imposing liability for forward looking statements if such are made with actual knowledge that the statement was false or misleading). The Court finds the omission of such language in the statute significant in concluding that the Second Circuit's pleading standard was not abrogated by the PSRLA. Congress intended the courts to determine whether a plaintiff has pled a "strong inference" of fraudulent intent, by examining the particular allegations of each case. A plaintiff can satisfy this burden by pleading motive and opportunity, conscious misbehavior, recklessness or by impressing upon the court a novel legal theory. As such, the Court finds that the "strong inference" scienter requirement of the PSLRA does not abrogate the Second Circuit's standard of pleading scienter for a securities fraud violation.

The Court now turns to the facts of the present case to determine whether the plaintiffs have met their burden of pleading a "strong inference" of the defendants' fraudulent intent.

### 1. *BDO*

■ The complaint alleges that BDO acted "to preserve the substantial annual revenues that it received from Health Management." Complaint ¶ 131. The plaintiffs allege that the Health Management account was one of the largest clients of BDO's Mitchel Field office. Complaint ¶ 13. In addition, throughout the class period, Bergman's wife was employed by BDO's Mitchel Field office as its Office Manager and Marketing Coordinator. Complaint ¶ 92. The Court finds that these allegations are insufficient to plead a "strong inference" of BDO's motive. The Court aligns itself with those courts that have held that a receipt of professional fees is not a sufficient motive to plead a "strong inference" of scienter. *See Zucker v. Sasaki,* 963 F.Supp. 301, 308 (S.D.N.Y.1997); *Duncan v. Pencer,* Fed.Sec.L.Rep. (CCH) ¶ 99,-043, 1996 WL 19043, at *9 (S.D.N.Y. Jan.18, 1996); *Sloane, supra,* 941 F.Supp. at 1382; *Friedman v. Arizona World Nurseries Ltd. Partnership,* 730 F.Supp. 521, 532 (S.D.N.Y. 1990), *aff'd mem.,* 927 F.2d 594 (2d Cir.1991).

■ Motive requires a showing of "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged" and opportunity requires a showing of "the means and likely prospect of achieving the concrete benefits by the means alleged." *Shields, supra,* 25 F.3d at 1128. The Second Circuit has adopted the "informed economic self-interest" test to evaluate whether motive has been sufficiently alleged. *See id.* at 1130. It is unreasonable to believe that BDO would willingly condone Health Management's fraud by risking its entire reputation, not only that of its Mitchel Field office, to preserve a fee which may be a large account in the Mitchel Field office but may be minute in comparison to all its accounts. *See Duncan, supra,* 1996 WL 19043, at *10. The Court does not believe that such conduct is in BDO's informed economic self-interest. Therefore, the Court concludes that the plaintiffs have not adequately pled motive by BDO to participate in the fraudulent scheme.

■ However, the Court finds that the complaint does allege facts which constitute strong circumstantial evidence of BDO's recklessness. "Reckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Chill v. General Electric Co.,* 101 F.3d 263, 268 (2d Cir.1996) (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978)). In fact, an auditor's conduct must "approximate an actual intent to aid in the fraud being perpetrated by the audited company." *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 120 (2d Cir.1982) (citation omitted).

The plaintiffs maintain that the following pleaded facts raise a "strong inference" of BDO's scienter: (1) the sheer size and variety of undisputed violations of generally accepted accounting principles ("GAAP") in Health Managements' financial statements (as evidenced by BDO's withdrawal of its own audit opinion) which BDO, as Health Management's auditor for more than six years, must have known or recklessly disregarded; and (2) BDO's clear violation of GAAS with respect to Health Management's accounts receivable.

The plaintiffs allege that BDO intentionally violated both GAAS and its own internal procedures by using the "Gross Profit Method" to test the accuracy of Health Management's inventory. Complaint 104–05. The plaintiffs maintain that this method, which under GAAS and BDO's procedures was never to be used "for annual GAAP financial statements," involved evaluating the reasonableness of the Company's inventory size by comparing Health Management's gross profit as a percentage of revenue to past years, after including and excluding the "in-transit" inventory. Complaint ¶ 104–05. The complaint alleges that BDO's audit opinion did

not mention the use of this method. Complaint ¶ 106.

The above violations of GAAP and GAAS provisions, without corresponding fraudulent intent, are insufficient to state a securities fraud claim. *See Chill, supra,* 101 F.3d at 270; *Duncan, supra,* 1996 WL 19043, at *10. However, the plaintiffs allege that BDO should have been aware of the "red flags" with regard to the "in-transit" inventory scheme. Specifically, the complaint alleges that BDO credulously accepted Health Management's statements given for the first time two months after the physical inventory counts, that approximately $1.8 million in inventory had been in-transit during the time of the physical count. Complaint ¶ 99. The plaintiffs allege that BDO should have been suspicious given that Health Management rarely, if ever, shipped significant amounts of inventory between its facilities and given that the amount purportedly in-transit would have been equal to nearly 50% of Health Management's year-end Fiscal 1995 inventory. Complaint ¶ 100.

In addition, the complaint alleges that the following "red flags" should have caused BDO to investigate further, or at least question its opinion: (1) BDO's failure to follow up on an analyst letter which alerted BDO of artificially inflated accounts receivable levels, by contacting the named sources of information about the accounts receivable fraud; and (2) BDO's apparent failure to exercise heightened scrutiny in response to the analyst letter and the SEC inquiry regarding Health Management's accounts receivable. In the Court's view, the allegations of BDO's ignorance of all of these "red flags" present evidence of its fraudulent intent. *See In re Leslie Fay Companies Inc.,* 871 F.Supp. 686, 699 (S.D.N.Y.1995), *modified on other grounds,* 918 F.Supp. 749 (1996) ("while [the defendant's] ignorance of warning signs might in one sense demonstrate it was merely negligent, allegations that, with gross recklessness, [the defendant] ignored multiple 'red flags' could reasonably support an inference that [the defendant] acted with intent' ").

The Court finds that the plaintiffs' allegations are similar to those alleged in *CMNY Capital, L.P. v. Deloitte & Touche,* 821 F.Supp. 152, 165 (S.D.N.Y.1993). In *CMNY,* the complaint specifically alleged facts in support of a theory of reckless disregard of auditing procedures. The complaint in *CMNY* listed actual, specific audit procedures that the defendant auditor failed to follow and explained why its failure to follow them was significant. *Id.* at 157. Similarly, in the present case, the plaintiffs have alleged that the violation of the auditing principles resulted in material misstatements of fact in the financials, and that BDO failed to follow proper audit procedures. These allegations, combined with the allegations of BDO's ignorance of numerous "red flags", are adequate to suggest that BDO turned a blind eye to Health Management's fraudulent activities, thus creating a "strong inference" of BDO's recklessness. *See In re Leslie Fay Companies, Inc. Securities Litig.,* 835 F.Supp. 167, 175 (S.D.N.Y.1993) ("Alleged fraud of this magnitude, coupled with plaintiffs' other allegations, creates an implication of recklessness, on the face of the pleading, which compels us to deny defendant's motion."). Therefore, BDO's motion pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the complaint for failure to state a claim upon which relief can be granted, is denied.

### 2. *Hotte and Belloise*

■ The plaintiffs allege that the Individual Defendants had the following three motives:

> The Individual Defendants participated in this wrongful conduct to inflate the price of . . . [Health Management's] common stock and to conceal the adverse facts concerning . . . [Health Management's] business and financial condition, so that they could (i) enhance the value of their extensive Health Management securities holdings; (ii) allow . . . [Health Management] to conclude various acquisitions by using the inflated value of its stock as merger consideration; and (iii) obtain financing on behalf of . . . [Health Management] to pursue various business acquisitions.

Complaint ¶ 12. In further explaining the first motive, the plaintiffs allege that the Individual Defendants "collectively held mil-

lions of dollars of Health Management common stock, as well as options to purchase additional shares of stock, the value of which would likely decline drastically should such adverse results be released to the public." Complaint ¶ 32. However, stock ownership, standing alone, "does not provide sufficient motive to sustain the pleading burden under Rule 9(b)". *Duncan, supra,* 1996 WL 19043, at *11 (citing *Shields,* 25 F.3d at 1131) (defendants' motive "to enhance the value of their personal holdings and options," and then "sell shares of Cott common stock they owned or acquired ... at inflated prices" is insufficient to plead scienter). Thus, the Court concludes that stock ownership, alone, does not create a "strong inference" of Hotte's or Belloise's motive for participation in the fraudulent scheme.

■ The Court further finds that the second and third motives alleged by the plaintiffs are also insufficient to plead a "strong inference" of Hotte's or Belloise's motive. *See Glickman v. Alexander & Alexander Services, Inc.,* Fed. Sec. L. Rep. (CCH) ¶ 99,-101, 1996 WL 88570, at *6 (S.D.N.Y.1996) (defendant's desire to raise capital is an insufficient allegation of motive). The plaintiffs do not expressly or even inferentially explain how the desire to conclude various acquisitions by using inflated value of the stock as consideration for mergers and to obtain financing for such acquisitions, is in the informed economic self-interest of the Individual Defendants beyond those expressly rejected by the Court above. *See Duncan, supra,* 1996 WL 19043, at *12–13. Therefore, the Court concludes that these two motives are insufficient to create a "strong inference" of Hotte's or Belloise's fraudulent intent.

■ In addition, the plaintiffs allege that Hotte possessed actual knowledge of the inventory fraud. Indeed, the plaintiffs allege that Hotte: (1) convened and was present at the June 9, 1995 meeting during which the inventory fraud was developed; and (2) approved the plan and directed that it be put into effect. Complaint ¶¶ 72–79. These allegations, if proved, furnish direct evidence of scienter. The Court finds that these specific factual allegations are certainly sufficient to

plead a "strong inference" of conscious misbehavior.

The plaintiffs further maintain that the in-transit inventory strategy and the accounts receivable plan were part of the same overall scheme to artificially inflate earnings. As its founder, President, Chairman of the Board, and second largest shareholder, the plaintiffs assert that Hotte was personally involved in Health Management's day-to-day affairs. As such, the plaintiffs maintain that Hotte must have known about the massive accounts receivable fraud. Although the mere pleading of Hotte's job title of senior management is insufficient to plead scienter, *see Duncan, supra,* 1996 WL 19043, at *14, the Court concludes that this allegation, together with the plaintiffs' allegations of actual knowledge of the inventory scheme and their allegations of Hotte's reckless disregard of evidence of the accounts receivable fraud including: (1) notice of SEC's "informal inquiry" into Health Management's accounts receivable; and (2) letters from outside auditors following the Fiscal 1994 and 1995 audits, alerting him of problems with accounts receivable, is sufficient to plead a "strong inference" of Hotte's conscious misbehavior and recklessness.

Hotte maintains that the plaintiffs do not allege that he had actual knowledge of the implications of the alleged in-transit inventory scheme on particular statements made in Health Management's filings, that he had actual knowledge of the scope of the scheme or that he was informed the scheme had been carried out. However, the Court is unaware of any legal precedent requiring that these particulars are necessary to plead scienter under Sections 10(b) and 10b–5 and therefore, the Court declines to adopt such a standard. Therefore, Hotte's motion pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss Count I of the complaint alleging a violation of Section 10(b) and Rule 10b–5, is denied.

■ regard to Belloise, the Court finds that the plaintiffs have not alleged a "strong inference" of recklessness or conscious misbehavior. The plaintiffs allege that as a result of her status as a member of the Board of Directors of Health Management, Belloise was responsible for monitor-

ing the overall management and direction of Health Management and was also privy to inside information. They maintain that the reality of Health Management's true financial condition and fraud was so obvious that Belloise must have been aware of the truth or closed her eyes to the truth. The Court finds these conclusory allegations are insufficient to demonstrate a "strong inference" of recklessness or conscious misbehavior. The plaintiffs do not provide specific allegations of fact in support of Belloise's alleged fraudulent conduct. *See Shields, supra,* 25 F.3d at 1129; *Decker, supra,* 681 F.2d at 121 ("conclusory allegations of fraudulent conduct are insufficient without specific allegations of fact"). As stated previously, Belloise's senior management position is insufficient to establish the requisite scienter.

The plaintiffs' reliance on *Degulis v. LXR Biotechnology, Inc.,* 928 F.Supp. 1301 (S.D.N.Y.1996), is misplaced. The court in *Degulis* held that the plaintiffs adequately alleged scienter, explaining its reasoning as follows:

> Each of the Individual Defendants occupied a position with or had a relationship with his or her Company, and it could thus be inferred that each was privy to confidential, proprietary information concerning the Company. As senior officers, directors and shareholders, it could be inferred that the individual Defendants were aware of market manipulation by a controlling person, and the financial position of the controlling person.

*Id.* at 1312.

This Court declines to adopt the *Degulis* court's holding in the present case. In doing so, the Court finds significant the *Degulis* court's recognition of the limitations of those allegations:

> Although the inference of scienter presented by these facts is not terribly strong, it is sufficient to permit Plaintiffs, who have not yet had the benefit of discovery, to offer evidence to prove it.

*Id.* This Court disagrees with this rationale and finds that such allegations as pled by the plaintiffs, do not create a "strong inference" of scienter. If the Court accepted this rule, the executives of virtually every corporation in the United States would be subject to fraud allegations. *See Ferber v. Travelers Corp.,* 785 F.Supp. 1101, 1107 (D.Conn.1991) (holding executive compensation insufficient to establish motive utilizing same rationale). Therefore, the Court finds that the plaintiffs have not alleged a "strong inference" of scienter on the part of Belloise and therefore grants the motion of the defendant, Virginia Belloise, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss Count I of the complaint, alleging a violation of Section 10(b) and 10b–5.

### C. "Controlling person" pursuant to Section 20(a)

Section 20(a) provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly induce the act or acts constituting a violation or cause of action.

Section 20(a) imposes only derivative liability upon so-called "controlling persons" of entities in violation of the Act who fail to show that they acted in "good faith." *See Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

In order to defeat a motion to dismiss at the pleading stage with regard to a "controlling person" allegation, a plaintiff must plead facts which "support a reasonable inference that [defendants] had the potential power to influence and direct the activities of the primary violator." *See Sloane Overseas Fund Ltd., v. Sapiens Intern. Corp.,* 941 F.Supp. 1369, 1378 (S.D.N.Y.1996); *Food and Allied Service Trades Dept., AFL–CIO v. Millfeld Trading Co., Inc.,* 841 F.Supp. 1386, 1392 (S.D.N.Y.1994). As the cases cited by the parties make clear, courts within the Second Circuit have not ruled consistently as to what allegations must be pleaded in order to state a claim for Section 20(a) liability. *See Food and Allied Service Trades Dept.,* 841 F.Supp. at 1390. In the seminal

case of *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973), the Second Circuit held that the intent of Section 20 was to impose liability only on those directors who fall within its definition of control *and* who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons. A number of subsequent cases, interpreting *Lanza, supra,* and *Gordon v. Burr,* 506 F.2d 1080, 1081 (2d Cir.1974), hold that a plaintiff must plead control and either scienter or culpable conduct. *See Robbins v. Moore Medical Corp.,* 788 F.Supp. 179, 188 (S.D.N.Y.1992); *In re Par Pharmaceutical, Inc. Sec. Litig.,* 733 F.Supp. 668, 679 (S.D.N.Y.1990); *Hemming v. Alfin Fragrances, Inc.,* 690 F.Supp. 239, 245 (S.D.N.Y. 1988).

The plaintiffs direct the Court to a separate line of cases interpreting the Second Circuit case, *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 716 (2d Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), which have held that neither scienter nor culpable participation is required to allege a *prima facie* case of control person liability. Rather, all that is required is an allegation of control status. *See Duncan, supra,* 1996 WL 19043, at *17; *Baxter v. A.R. Baron & Co., Inc.,* Fed. Sec. L. Rep. ¶ 99,351 (CCH), 1996 WL 586338, at *5–6 (S.D.N.Y. Oct.11, 1996); *Food and Allied Service Trades Dept., supra,* 841 F.Supp. at 1391; *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.,* 735 F.Supp. 587, 591 (S.D.N.Y.1990); *In re Citisource, Inc. Securities Litig.,* 694 F.Supp. 1069, 1076 (S.D.N.Y.1988).

Reviewing these inconsistencies, the court in *Food and Allied Service Trades Dept., supra,* 841 F.Supp. at 1390, held that pleading substantial stock ownership, or officer/director status from which control can be directly inferred, is sufficient to allege control liability. *See also Sloane, supra,* 941 F.Supp. at 1378. In reaching that conclusion, the court distinguished between establishing control status for purposes of summary judgment or trial as differentiated from the pleading stage:

> Requiring plaintiffs to allege more than control status in their complaint would er-

roneously import into the pleading stage the Second Circuit's standard of proof at trial, where the liability is assigned only to those controlling persons "who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons."

*See id.* at 1390 (quoting *Lanza,* 479 F.2d at 1299).

The court furthered reasoned that *Marbury Management, supra,* 629 F.2d at 716, establishes that once plaintiffs have pleaded control status, the burden shifts to defendants to prove that they acted in good faith. *See id.* Thus, knowledge and culpability are not elements of a *prima facie* case. Instead, they constitute an affirmative defense. *See id.; Borden, supra,* 735 F.Supp. at 589; *Citisource, supra,* 694 F.Supp. at 1077.

This Court aligns itself with the line of cases, based on *Marbury Management, supra,* which provides the most recent statement of the Second Circuit's standard, and holds that a *prima facie* case of controlling person liability requires only a pleading of control status, not of scienter or culpable participation. The Court finds that these cases provide the most logical reconciliation of the three Second Circuit decisions on the subject of Section 20(a) liability. *See Duncan, supra,* 1996 WL 19043, at *16–18; *Borden, supra,* 735 F.Supp. at 588–90; *In re Citisource, supra,* 694 F.Supp. at 1076–77.

**1.** *Hotte*

 Although not statutorily defined, the SEC has defined "control" as follows:

> the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a [violator], whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 240.12b–2 (1995). The Court finds that the plaintiffs have alleged that Hotte "controlled" Health Management, as that term is defined by the above SEC definition.

The plaintiffs allege that the Individual Defendants

> were each controlling persons of Health Management within the meaning of Sec-

tion 20 of the Exchange Act by reason of their management positions in Health Management, their membership on the Company's Board, their extensive equity interest in the company, and/or their direct and necessary participation in the fraudulent acts alleged herein. Because of their positions in the Company and/or their stock ownership, the Individual Defendants had the power and influence to cause Health Management to engage in the unlawful acts and conduct alleged herein. Complaint ¶ 12. In addition, the complaint alleges that Hotte signed Health Management's Form 10–Q for the first three quarters of Fiscal 1995 and the first two quarters of Fiscal 1996, the 1995 Form 10–K, as well as the letters to shareholders dated December 18, 1994 and August 5, 1995. Complaint ¶ 125. The Court finds these allegations of control sufficient to plead a violation of Section 20(a). *See Duncan, supra,* 1996 WL 19043, at *18 (citing cases); *Robbins v. Moore Medical Corp.,* 788 F.Supp. 179, 188 (S.D.N.Y.1992). Therefore, the Court denies Hotte's motion pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss Count II of the complaint.

### 2. *Belloise*

Like Hotte, the allegations against Belloise are sufficient to plead control. It is alleged that Belloise was a member of Health Management's Board of Directors during the class period. It is also alleged that Belloise owned or controlled with her husband, co-defendant Hotte, in excess of 11.4% of Health Management's outstanding common stock. Complaint ¶ 8. In addition, Belloise is alleged to have signed the 1995 Form 10–K which is alleged to be false and misleading. Complaint ¶¶ 54, 125. In addition, Belloise's marriage to Hotte evidences her control status as well. *See Baxter, supra,* Fed. Sec. L. Rep. (CCH) ¶ 99,351 at 96,154, 1996 WL 586338, at *6 (quoting *Drobbin v. Nicolet Instrument Corp.,* 631 F.Supp. 860, 884 (S.D.N.Y.1986)) ("Stock can be a means of control over a corporate entity.... Other means include 'other business relationships, interlocking directors, family relationships and a myriad of other factors'."). Therefore, Belloise's motion pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss Count II of the complaint, is denied.

### D. *Motion for a more definitive statement*

Fed.R.Civ.P. 12(e) provides in pertinent part:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading.

The rule requires that the motion should not be granted "unless the complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it." *Bower v. Weisman,* 639 F.Supp. 532, 538 (S.D.N.Y. 1986) (quoting *Boothe v. TRW Credit Data,* 523 F.Supp. 631, 635 (S.D.N.Y.1981)).

Where the complaint complies with the requirements of Fed.R.Civ.P. 8, which sets forth the "General Rules of Pleading", so that it gives the defendant fair notice of the general nature of the action, the motion will not be granted. *See Kirlin v. Conopco, Inc.,* No. 94 CIV. 2675, 1995 WL 15468, at *3 (S.D.N.Y. Jan. 17, 1995) (holding that the purpose of the complaint is to inform the defendant of the general nature of the action and the motion should be denied if the complaint complies with Rule 8); *Gerzof v. Coons,* Fed. Sec. L. Rep. (CCH) ¶ 95,478, 1990 WL 129976, at *3 (E.D.N.Y. Aug.7, 1990) ("If the pleading meets the requirements of Rule 8 ... and fairly notifies the opposing party of the nature of the claim, [the] motion ... will not be granted."). Fed. R.Civ.P. 12(e) is therefore designed to remedy unintelligible pleadings rather than correct lack of detail. *Kirlin, supra,* 1995 WL 15468 at *3.

When fraud is asserted, the Court must harmonize Fed.R.Civ.P. 8 and 12(e) with Fed.R.Civ.P. 9(b), *see Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990); *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987), which provides as follows:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

*See also Acito, supra,* 47 F.3d at 51–52. However, Fed.R.Civ.P. 9(b) does not require that the pleading contain "detailed evidentiary matter." *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 n. 20 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980) (citation omitted). A pleading must merely meet the requirements of the three goals of Fed.R.Civ.P. 9(b), which are:

(1) to provide a defendant with fair notice of a plaintiff's claim, to facilitate preparation of a defense;

(2) to protect a defendant from harm to his or her reputation or goodwill;

(3) to reduce the number of strike suits.

*O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991).

To satisfy the particularity requirement of Fed. R.Civ.P. 9(b), a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which the plaintiff contends the statements were made, state when and where the statements were made and identify those responsible for the statements. *Acito, supra,* 47 F.3d at 51; *McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his or her alleged participation in the fraud. *DiVittorio,* 822 F.2d at 1247. However, the Second Circuit has adopted the "group pleading presumption" which provides that no specific connection between fraudulent representations or omissions need be pleaded when the facts are exclusively within the defendant's knowledge, as is the case when defendants are insiders or affiliates participating in the statements at issue. *See id.; Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986); *In re MTC Electronic Technologies Shareholders Litig.,* 898 F.Supp. 974, 979 (E.D.N.Y.1995). In addition,

[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other "group published information", it is reasonable to presume that these are the collective actions of the officers. Under such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations.

*Wool v. Tandem Computers Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987) (citations omitted).

In the present case, the complaint alleges that Hirsh and Myers participated in the fictitious "in-transit" inventory aspect of the fraudulent scheme to bolster Health Management's earnings for Fiscal 1995. Specifically, the plaintiffs maintain that Myers was in attendance at the meeting on or about June 9, 1995, together with Bergman, Michael Norman, Health Management's Chief Operating Officer, and Hotte, during which the "in-transit" inventory scheme was devised. See Complaint ¶ 74. The plaintiffs maintain that Myers consented to such fraudulent plan. Complaint ¶ 75. It is further alleged that immediately following the meeting, Bergman placed a telephone call to Hirsh at HMI Pennsylvania and directed Hirsh to complete an inventory transfer form reflecting the transfer of approximately $520,000 worth of infertility medication from the Pittsburgh facilities to a New York facility. Although Hirsh was allegedly aware that the transfer had not occurred, he completed the form and directed HMI Pennsylvania pharmacist Bob Fleckenstein ("Fleckenstein") to sign Hirsh's name on the form. A similar inventory transfer form was completed in New York and forwarded to HMI Pennsylvania. Once again, Hirsh allegedly directed Fleckenstein to sign Hirsh's name, indicating that the inventory had been received.

Despite the above allegations, Hirsh and Myers maintain that the plaintiffs have failed to plead fraud with the requisite particularity, seeking a more definitive statement of their participation in the alleged fraudulent scheme. Hirsh and Myers contend that the complaint is vague and ambiguous within the

meaning of Fed.R.Civ.P. 12(e) because it fails to delineate the specific acts engaged by each defendant in the alleged fraudulent scheme. They contend that the conduct attributed to the "Individual Defendants" is not attributable to them and that a more definite statement is required from the plaintiffs so that their "appropriate responses can be framed." Memorandum of Law in Support of the Motion of Defendants Irwin Hirsh and Lloyd N. Myers for a More Definite Statement ("Hirsh and Myer's Mem. in Support") at 5. The Court finds Hirsh and Myers arguments unavailing.

■■■■ Although the Supreme Court has eliminated secondary liability for aiders and abettors of securities fraud, *see Central Bank of Denver v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), primary liability under Rule 10b–5 may be imposed "not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration", *see S.E.C. v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1471 (2d Cir.1996) (quoting *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994)). The plaintiffs have alleged facts implicating Hirsh and Myers in the "in-transit" inventory portion of the overall fraudulent scheme to impart to the investment community an artificial earnings statement. Under *First Jersey Securities,* the plaintiffs need not allege that Hirsh and Myers made any fraudulent statements during the Class Period.

In addition, the group pleading presumption applies to Hirsh and Myers. Hirsh and Myers are alleged to have been officers of Health Management or of its wholly owned subsidiary. Myers is alleged to have been Health Management's Vice President for Program Development. Hirsh is alleged to have been Vice President for Purchasing and Managed Care Contracts at HMI Pennsylvania. Although Hirsh and Myers may not have been top level officers of Health Management, the Court finds that the plaintiffs have alleged that they were "insiders", falling within the group pleading presumption. In this respect, Hirsh and Myers are akin to outside directors, who "although almost by

definition [are] excluded from the day-to-day management of a corporation, can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, ... have access to information more akin to a corporate insider." *Hallet v. Li & Fung, Ltd.,* Fed. Sec. L. Rep. (CCH) ¶ 99,318, 1996 WL 487952 (S.D.N.Y. August 27, 1996) (citing *XOMA Corp. Securities Litig.,* 1990 WL 357807 (N.D.Cal. Dec.27, 1991)). Indeed, the plaintiffs' allegations of Hirsh and Myers' involvement in the "in-transit" inventory scheme evidence their "insider" status. This case does not present a situation where the sole allegations against Hirsh and Myers are based on their affiliations with the other defendants, see *Ouaknine, supra,* 897 F.2d at 80 (dismissing action as to defendant corporation where sole allegation against it was its affiliation with two other defendants), or on their tenuous connection with the fraudulent scheme. See *DiVittorio,* 822 F.2d at 1248 (dismissing action as to those defendants not tied to the offering memorandum in any specific way or even alleged to have been an officer or director during the relevant time period). The Court concludes that these allegations, together with the substantial stock ownership by Hirsh and Myers, are sufficient to plead that Hirsh and Myers are "insiders" and thus included within the group pleading presumption.

Hirsh and Myers are alleged to have caused Health Management to engage in illegal practices by their acquiescence and participation in the "in-transit" inventory scheme. The allegations made by the plaintiffs make easily identifiable the basic transaction in which the plaintiffs base their claim for fraud. The allegations state what the misrepresentations were, when, where, why and in what context they were made. In the Court's view, Hirsh and Myers' request that the plaintiffs specify their specific role in the alleged fraudulent scheme can be obtained through discovery. "[A] motion for a more definite statement is not a substitute for discovery." J. Moore & J. Lucas, 2A Moore's Federal Practice at 12–141—12–143 (2d ed.1986). The Court concludes that Hirsh and Myers stand sufficiently apprised

**210**

of the claims against them to enable them to respond to the plaintiffs' allegations. Accordingly, Hirsh and Myers' motion pursuant to Fed.R.Civ.P. 9(b) and 12(e), for a more definitive statement, is denied.

### III. CONCLUSION

Having reviewed the parties' submissions, and heard oral argument, and for the reasons set forth above; it is hereby

**ORDERED**, that the defendant, BDO Seidman LLP's motion pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss the complaint for failure to state a claim upon which relief can be granted, is denied; it is further

**ORDERED**, that the defendant, Clifford E. Hotte's motion pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the complaint for failure to state a claim upon which relief can be granted, is denied; it is further

**ORDERED**, that the defendant, Virginia Belloise's motion pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss Count I of the complaint for failure to state a claim upon which relief can be granted, is granted; and it is further

**ORDERED**, that the defendant, Virginia Belloise's motion pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss Count II of the complaint for failure to state a claim upon which relief can be granted, is denied; and it is further

**ORDERED**, that the defendant, Irwin Hirsh and Lloyd N. Myers' motion pursuant to Fed.R.Civ.P. 9(b) and 12(e), for a more definitive statement, is denied.

**SO ORDERED.**