**In re TWINLAB CORPORATION SECURITIES LITIGATION.**

No. 98–CV–7425.

United States District Court,
E.D. New York.

July 5, 2000.

Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Robert P. Sugarman, Samuel H. Rudman, Sanford Dumain, Andrea McBarnette, of counsel, for plaintiffs.

Schiffrin & Barroway, LLP, Bala Cynwyd, PA, Marc A. Topaz, Gregory M. Castaldo, David Kessler, of counsel, for plaintiffs.

Wilkie, Farr & Gallagher, New York City, Michael Young, John R. Oller, Tony Yanez, of counsel, for defendant Twinlab Corp.

Simpson, Thacher & Bartlett, New York City, Michael Chepiga, Lauren J. Rosenblum, of counsel, for defendant John McCusker.

Mayer, Brown & Platt, New York City, Dennis Orr, Richard Spehr, Anthony Diana, of counsel, for defendants Ross Blechman and Dan Blechman.

Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, Jay B. Kasner, Joanne Gaboriault, of counsel, for defendants Bear, Stearns & Co., Inc. and Donaldson, Lufkin & Jenrette Securities Corp.

Schulte, Roth & Zabel, New York City, Daniel J. Kramer, of counsel, for defendants Green Equity Investors II, LP; Leonard Green & Partners, LP; John G. Danhakl; and Jennifer Holden Dunbar.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This class action securities fraud case was brought by purchasers of stock in Defendant Twinlab Corp. ("Twinlab") against the corporation, its underwriters, and its directors and officers, alleging that the company engaged in fraudulent accounting and business practices in an effort to artificially inflate its stock price. Presently before the Court are motions to dismiss the complaint by each of the Defendants.

## BACKGROUND

Twinlab is a Delaware corporation with its principal place of business in Hauppauge, N.Y., and is engaged in the manufacture and wholesale distribution of various vitamins, mineral supplements, herbal remedies, and other non-prescription health and nutritional aids. Twinlab stock is traded on the NASDAQ stock exchange. The Plaintiffs, a class of purchasers of Twinlab stock from April 8, 1998 through February 24, 1999 ("the Class Period"), allege that during that time, Twinlab engaged in a fraudulent accounting practice known as "earnings management" and a deceptive business practice called "channel stuffing" to artificially inflate sales and earnings figures for the company so as to fraudulently raise the value of the stock.

### A. The secondary offering prospectus

In the Spring of 1998, Twinlab, through underwriters Defendant Bear, Stearns & Co. ("Bear, Stearns") and Defendant Donaldson, Lufkin & Jenrette ("DLJ"), was preparing for a secondary offering of some 9.2 million shares of Twinlab stock. In conjunction with the secondary offering, Twinlab published a prospectus containing relevant financial information. According to the Plaintiffs, the prospectus made the following misleading statements:

(a) that in the first quarter of 1998, Twinlab received "a substantial increase in orders for its herbal supplement products";

(b) that Twinlab believes "that there has been no material decline in retail sales of its vitamin, mineral and nutritional

supplements products during the first quarter of 1998;" and

**(c)** that "there has been adequate inventory of its products in the distribution channel."

The Plaintiffs contend that, in reality, Twinlab had suffered a decline in retail sales in the first quarter of 1998, and that it was concealing this decline by a practice known as "earnings management." In essence, Twinlab was taking accounting credit for sales of products in the first quarter of 1998, even though it had not completely shipped the products to the customers before the end of the quarter. Twinlab's prospectus included a statement of its accounting practices that indicates that "revenue from product sales is recognized at the time of shipment to the customer." In addition, the Plaintiffs allege that "growth at Twinlab was materially overstated because the Company was ... stuffing its distribution channels with product at volumes that would not be sustained in later quarters [channel stuffing]."

The secondary offering took place on April 8, 1998. Approximately 9.2 million shares of Twinlab were sold, roughly half by Twinlab and half by Defendant Green Equity Investors II ("GEI"), who had previously held nearly a third of Twinlab's stock. On the day of the secondary offering, Twinlab's stock price was $36.50 per share, and the secondary offering yielded a total sum of roughly $ 335,000,000.

**B. The April 28,1998 press release and first quarter 1998 10-Q form**

On April 28, 1998, Twinlab issued a press release regarding its first quarter 1998 performance. Twinlab reported that its net sales for first quarter 1998 were $73.5 million, a 43.5% increase from the first quarter of 1997; that its net income for the first quarter of 1998 was $8 million, an increase of 40.9% from 1997; and that its earnings had risen to $.29 per share, 38.1% higher than the previous year. According to the Plaintiffs, those figures were falsely inflated because of Twinlab's

practice of earnings management. In addition, the Plaintiffs allege that the press release contained additional misrepresentations:

**(a)** that Twinlab's "private label herbal product sales increased to $18.1 million" for the quarter; and

**(b)** that "during the first quarter of 1998, the Company received a substantial increase in the orders for its herbal supplement products ... due to strong demand at the retail level"

According to the Plaintiffs, these statements were false as they failed to reveal the financial impropriety of Twinlab's "earnings management," and because it failed to reveal the "channel stuffing" that was taking place. As mentioned above, the Plaintiffs allege that, were it not for Twinlab's accounting improprieties, the company would report a decline in retail sales for the first quarter of 1998.

On May 15, 1998, Twinlab filed its first quarter 1998 10-Q form with the Securities and Exchange Commission. It recited the allegedly false sales figures mentioned in the press release. In actuality, as was eventually revealed in March 1999, Twinlab's sales for first quarter 1998 were $69.6 million, not $73.5 million; its net income for the quarter was $6.9 million, not $8 million; and its earnings per share was actually $.25, not $.29.

**C. The purchase of PR nutrition and the second quarter 10-Q form**

On June 9, 1998, Twinlab signaled its intent to purchase a competitor called PR Nutrition, in an effort to capture a share of the profitable energy bar market. Twinlab proposed a stock exchange with PR Nutrition, by which Twinlab would gain control of PR Nutrition in exchange for 1 million shares of Twinlab stock of a value of between $38.50 and $42.00 per share.

As will be discussed later, market developments in the Summer of 1998 caused Twinlab's stock price to drop, and as the purchase of PR Nutrition neared a closing

in August 1998, Twinlab had agreed to tender 1.3 million shares to PR Nutrition. In the final days preceding the closing of the sale, Twinlab's stock price recovered slightly, and the parties agreed that the sale price of PR Nutrition would be 1.15 million shares of Twinlab stock. According to the Plaintiffs, the partial recovery of Twinlab stock was the result of the false statements made by Twinlab described herein.

On July 28, 1998, Twinlab issued a press release regarding its second quarter 1998 financial results. The Plaintiffs claim that these statements in the press release regarding its earnings were materially false, again because of Twinlab's practices of "earnings management" and "channel stuffing." The Plaintiffs contend that Twinlab made additional false statements in the press release regarding its perceived growth opportunities in its distribution channels. Also, the Plaintiffs allege that the July 1998 press release failed to disclose problems Twinlab was having in producing its TruHerb product line.

The press release also contained semi-annual financial information, reflecting Twinlab's performance for the first half of 1998. The Plaintiffs allege that this information was false for the same reasons described above.

On August 14, 1998, Twinlab filed its second quarter 10–Q form with the SEC. The second quarter 10–Q reported net sales of $78.5 million, net income of $5.4 million, and earnings of $.27 per share. As Twinlab would eventually acknowledge in March of 1999, these figures were incorrect. In actuality, second quarter 1998 net sales were $77.6 million, not $78.5 million; net income was $5.2 million, not $5.4 million, and earnings were $.25 per share, not $.27. The Plaintiffs claim these statements were materially false because of Twinlab's "earnings management" and "channel stuffing."

### D. The GNC announcement and Twinlab's August 5, 1998 press release

On August 3, 1998, GNC, a major distributor of Twinlab's products, announced that it was not going to reach its revenue targets due to increased competition, and that it was going to request that its suppliers, including Twinlab, discount their products. GNC's announcement caused stock prices in the sector to fall, and Twinlab's stock, which had been trading in and around the $40 range prior to the announcement, fell into the mid–$20 levels.

Two days after GNC's announcement, on August 5, 1998, Twinlab issued a press release regarding the GNC statement. According to the Plaintiffs, that press release contained numerous false statements, including:

(a) that all of Twinlab's distribution channels had performed as expected in the first half of 1998;

(b) that financial results for the first six months of 1998 showed increases of 40–50% over the prior year, and that sales to GNC were a decreasing percentage of overall sales;

(c) that Twinlab would soon be introducing two new product lines, including the TruHerbs line; and

(d) that pricing fundamentals for the company remained unchanged.

The Plaintiffs contend that these statements were materially false because of Twinlab's practices of "earnings management" and "channel stuffing"; because Twinlab had not yet renewed its annual distribution contract with GNC that would expire the next month; Twinlab's relationships with other retailers was straining its relationship with GNC; and because the company was experiencing difficulties with its TruHerbs line.

### E. The third quarter 1998 10–Q

On October 15, 1998, Twinlab issued a press release in anticipation of its third quarter 1998 earnings. It announced that it expected net sales to be $80–90 million,

earnings per share of $.34, and that the company's financial results were "in line with consensus estimates" by Wall Street analysts. The Plaintiffs contend these statements were materially false for the reasons described above.

On October 27, 1998, Twinlab issued another press release announcing its financial results for the third quarter 1998. According to the Plaintiffs, the press release contained materially fraudulent statements including:

(a) that third quarter results reflect "solid sales increases throughout our distribution channels";

(b) that a decline in orders in the third quarter was offset by, among other things, the "successful introduction of our new Twinlab TruHerbs and Twinlab Ironman products collectively to 13,000 mass market outlets late in the third quarter"; and

(c) that Twinlab expected a significant improvement in sales in the fourth quarter "in line with our customer's (sic) current strong retail sell through."

The Plaintiffs claim that these statements were false not only because of the "earnings management" and "channel stuffing" claims, but also because the company had not actually introduced its TruHerb line.

Twinlab filed its third quarter 10–Q on November 16, 1998. The Plaintiffs assert that several statements in the third quarter 10–Q were fraudulent because of the aforementioned reasons, as well as the fact that Twinlab had improperly assessed merger costs from the PR Nutrition purchase and thus inflated its profits, and the fact that Twinlab held open its books for an extra 5 days into the fourth quarter in order to inflate its revenues in the third quarter.

### F. The fourth quarter 1998 projections and subsequent admissions

On November 30, 1998, Twinlab announced that its fourth quarter profits would fall far below the Wall Street esti-mates of $.40 a share, and would in fact only be about $.23 to $.26 per share. Twinlab cited "excess levels of inventory in the mass market due to large initial purchase orders in the first half of 1998" as the reason for the declining fourth quarter sales. The Plaintiffs contend that this statement is an admission that Twinlab had been engaging in "channel stuffing" in the preceding months. Twinlab also blamed the low earnings expectations on a delay in the roll out of the TruHerb line because of problems with an outside vendor's packaging, although the company had claimed in the October 27, 1998 press release that TruHerbs had been "success-ful[ly] introduc[ed]" in the third quarter 1998. As a result of the November 30, 1998 announcement, Twinlab's stock price dropped from $18.25 per share to $13.00.

On February 24, 1999, Twinlab announced that a year-end audit of its books had revealed that it had been incorrectly reporting its sales in the first, second, and third quarters of 1998 and was adjusting those figures accordingly. According to the company's statement, "the adjustments relate to irrevocable, unconditional, bona fide sales orders that were received within a quarter but not completely shipped before the end of the quarter." The adjustments resulted in net sales being reduced in the first quarter from $75.8 million to $74.7 million, in the second quarter from $84.3 million to $83.3 million, and in the third quarter from $90.6 million to $84.4 million. The corresponding reduction in earnings was a drop from $.35 per share to $.29 per share in the first quarter, $.30 per share to $.29 per share in the second quarter, and $.31 per share to $.25 per share in the third quarter. The Plaintiffs contend that even these figures are softened by Twinlab simultaneously "pooling interests" from the PR Nutrition merger, resulting in the earnings figures being improperly inflated by an additional $.01–$.04 per share. The Plaintiffs do not explain what "pooling interests" refers to, nor whether they consider such a practice to be fraudulent or

deceptive. The February 24, 1999 announcement resulted in a further drop of Twinlab's stock price to $7 per share.

On March 30, 1999, Twinlab filed amended 10-Q reports for 1998 that confirmed the adjustments to the revenue figures, and revealed that Twinlab had also misreported its financial results from fiscal year 1997 because of the same accounting errors. The Plaintiffs allege that these reporting errors were a deliberate scheme by Twinlab to inflate sales figures for current quarters so as to meet earnings estimates for the company by Wall Street analysts, since a failure to meet such estimates often results in a stock's price falling significantly. The Plaintiffs contend that, had Twinlab not manipulated its earnings figures, it would have failed to meet analysts' expectations and its stock price would have dropped. According to the Plaintiffs, Twinlab wanted its stock price to remain elevated to maximize the proceeds from their secondary offering in April 1998; to finance to purchase of PR Nutrition via a stock swap while turning over the lowest possible number of shares; and generally to enrich the officers and directors of Twinlab, who hold a significant portion of the company's stock.

The Plaintiffs filed a class action complaint on May 14, 1999, asserting 5 causes of action. The first cause of action, alleged against Twinlab and its officers and directors, Defendants Ross Blechman, Dean Blechman, John McCusker, John Danhakl and Jennifer Holden Dunbar (collectively referred to as "Twinlab Defendants"); Bear, Stearns; and DLJ, alleges that the Registration Statement and prospectus for the secondary offering issued by those Defendants was materially false and misleading in violation of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k. The second cause of action claims that the Twinlab Defendants, Defendants GEI and its management company Defendant Leonard Green & Partners, LP ("LGP," and together with GEI, "the Partnerships"); Bear, Stearns; and DLJ sold stock pursuant to a materially false Registration Statement and prospectus in violation of Section 12(a)(2) of the Securities Act of 1933. The third cause of action names Defendants Ross Blechman, Dean Blechman, McCusker, Denhakl, and Dunbar, along with the Partnerships, and alleges a violation of Section 15 of the Securities Act, charging these Defendants with control person liability for the violations alleged in the first and second causes of action.

The fourth cause of action is alleged against Twinlab, Ross and Dean Blechman, and McCusker pursuant to Section 10-b and Rule 10b-5 of the Securities and Exchange Act of 1934. This cause of action alleges that these Defendants engaged in a scheme to defraud purchasers of Twinlab stock as described above. The fifth cause of action seeks control person liability against Defendants Ross and Dean Blechman and McCusker under Section 20 of the Securities and Exchange Act for the fraud alleged in the fourth cause of action.

Each of the Defendants filed motions to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6). Twinlab contends that the Plaintiffs' allegations fail to sufficiently plead the elements of a fraud claim under Section 10-b; fail to adequately allege motive and opportunity to commit fraud; fail to demonstrate that the secondary offering was in any way misleading; and fail to establish that the Plaintiffs actually purchased their shares in the secondary offering. Defendants Dean and Ross Blechman join in Twinlab's motion, and also challenge the Plaintiffs' assertions regarding their individual motive to commit fraud and their knowledge of the misleading statements. They further deny that control person liability exists because the Plaintiffs' claims are insufficient to establish an underlying wrong and because the Plaintiffs fail to allege sufficient culpable acts. Defendant McCusker moves separately on essentially the same grounds as the Blechman. Defendants Denhakl, Dunbar, GEI and LGP focus their arguments

on whether the Plaintiffs' Securities Act claims in the first, second, and third causes of action are, in actuality, claims for fraud and should be subject to the pleading standards of Rule 9(b), which these Defendants claim the Plaintiffs failed to meet. In addition, these Defendants incorporate the arguments by Twinlab and allege that the Plaintiffs fail to plead a viable control person claim. Finally, Defendants Bear, Stearns and DLJ also argue that the causes of action against them should be held to Rule 9(b)'s pleading requirements and that the Plaintiffs fail to meet those standards.

### DISCUSSION

The court may not dismiss a complaint under Fed.R.Civ.P. 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *King v. Simpson*, 189 F.3d 284, 286 (2d Cir.1999); *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996). The court must accept as true all factual allegations in the complaint as true and draw all reasonable inferences in favor of plaintiff. *Id.; Jaghory v. New York State Dept. of Educ.*, 131 F.3d 326, 329 (2d Cir.1997). The issue to consider is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995). The court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.1999); *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999).

### 1. As to the first cause of action under Section 11 of the Securities Act

■ Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, states:

In case any part of the registration statement … contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security [may] sue (1) every person who signed such registration statement [or] (2) every person who was a director of … the issuer at the time of the filing. . . .

Section 11 "places a relatively minimal burden on a plaintiff," requiring simply that the plaintiff allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Feiner v. SS & C Technologies*, 11 F.Supp.2d 204, 207 (D.Conn.1998). An omission is "material" if there is a substantial likelihood that the "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available." *Steinberg v. PRT Group, Inc.*, 88 F.Supp.2d 294, 300 (S.D.N.Y.2000) *citing TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Put differently, a complaint may not properly be dismissed pursuant to 12(b)(6) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance. *Steinberg*, 88 F.Supp.2d at 300. Because materiality is generally a question of fact, it is unlikely that a cause of action turning on materiality would be dismissed as a matter of law. *Feiner*, 11 F.Supp.2d at 208.

### a. As to the Plaintiffs' standing

■ The Defendants allege that the Plaintiffs fail to sufficiently allege standing on their Section 11 claims, since they do not specifically allege that they bought

their stock at the time of the secondary offering.

Standing under Section 11 is not limited to purchasers who directly participated in the public offering covered by the allegedly misleading registration statement and prospectus. *In re Ultrafem, Inc.*, 91 F.Supp.2d 678, 694 (S.D.N.Y.2000), *citing Milman v. Box Hill Sys. Corp.*, 192 F.R.D. 105 (S.D.N.Y.2000) *and Salomon Smith Barney v. Asset Securitization Corp.*, 1999 WL 1095605 (S.D.N.Y.1999). In *Ultrafem*, the court held that an allegation that the plaintiffs purchased the stock "pursuant to and/or traceable to the Registration Statement" was sufficient to create standing for a Section 11 claim. *See also In re Fine Host Corp.*, 25 F.Supp.2d 61, 66–67 (D.Conn.1998), *citing Barnes v. Osofsky*, 373 F.2d 269, 272 (2d Cir.1967).

The Plaintiffs here have used this exact language in their complaint. Specifically, they allege that "Plaintiff Ronald Drucker [representing all other class members] purchased Twinlab common stock issued in the Secondary Offering pursuant to or traceable to a materially false and misleading Prospectus." This allegation is sufficient to create standing for the Section 11 claim.

### b. As to the allegations of material misrepresentations

The Plaintiffs' contention that the registration statement was materially misleading is based on two alleged omissions: Twinlab's failure to disclose that it was improperly recognizing revenue on uncompleted sales in violation of its own accounting principles, and its failure to indicate that it had suffered a material decline in retail sales in the first quarter of 1998.

■ There can be little dispute that Twinlab's quarterly financial reports throughout 1997 and 1998 were inaccurate as a result of Twinlab's practice of recognizing revenue before sales were actually completed. Indeed, this practice is directly contradictory to the "Summary of Accounting Principles" included as an exhibit

to the registration statement that states that "revenue from product sales is recognized at the time of shipment to the customer." Viewed in the light most favorable to the Plaintiffs, the complaint alleges that Twinlab was consistently "robbing Peter to pay Paul"; accelerating the recognition of revenues into an earlier financial quarter; and therefore portraying the company's current performance as more robust than it actually was. This is undoubtedly a fact that a reasonable investor would have considered important when attempting to review Twinlab's financial performance from 1997 and in early 1998.

Twinlab nevertheless contends that the Plaintiffs have only alleged that *quarterly* financial reports were plagued by the accounting error, while the registration statement and prospectus contain only *annual* financial data which the Plaintiffs do not specifically attack. In the Court's view, this distinction is unavailing. It can be logically inferred that the same misapplication of accounting principles that allowed Twinlab to recognize third quarter 1997 sales in the second quarter of that year also allowed it to recognize sales from the first quarter of 1998 in the fourth quarter of 1997, thus making the annual 1997 figures cited in the registration statement misleading as well. At this stage of the litigation and in these motion situations, the Court must draw all reasonable inferences in the Plaintiffs' favor, and the Court therefore finds that the Plaintiffs have adequately alleged the omission of a material fact in Twinlab's failure to disclose its true accounting practices and inclusion of misleading financial data in the prospectus and registration statement.

■ The Plaintiffs also allege that Twinlab failed to state that there had been a "material decline in the Company's retail sales" during the first quarter of 1998. There appears to be some confusion as to what specifically the Plaintiffs refer to as "retail sales." Twinlab contends that it is a wholesale seller, and that it makes no "retail"—*i.e.* "direct-to-customer"—sales.

A reasonable reading of the Plaintiffs complaint, which links the practice of accelerating recognition of sales on unshipped products to the concealment of a decline in "retail sales," *see e.g. complaint* ¶ 45(g), suggests that the Plaintiffs use the expression "retail sales" to mean "net sales." If this is the case, and assuming that the Plaintiffs' contention is true (which the Court must at this stage), the Plaintiffs have adequately pleaded that the assertion in the registration statement that "the Company anticipates that its *overall growth rate in net sales* in the first quarter of 1998 will be comparable to that achieved in the first quarter of 1997" is false and misleading. (Emphasis added.)

On the other hand, if the complaint is read literally to allege that consumer-level "retail sales" had declined in first quarter 1998, this would contradict Twinlab's claim in the registration statement that there is "increased demand at the retail level" for Twinlab's herbal products and "no material decline in retail sales of its vitamin, mineral, and nutritional supplement during the first quarter of 1998." Taken together, these two statements suggest that overall retail sales increased in the first quarter of 1998. Thus, no matter how the Plaintiffs complaint is interpreted, if the Plaintiffs are eventually able to prove their assertion that Twinlab suffered a "material decline in retail sales for the first quarter of 1998," they may succeed in demonstrating that a portion of the registration statement is materially false.

■ Finally, the complaint contains additional allegations that, if proven, would also constitute misrepresentations that a reasonable investor would consider significant. The complaint alleges that Twinlab held its Third Quarter 1998 books open an extra five days, thus inflating their sales figures in that quarter. The complaint also alleges that Twinlab falsely stated on October 27, 1998 that the TruHerbs line of products had been "succesful[ly] introduc[ed]," when, in fact, the product line had not yet been launched. This misstate-

ment is particularly meaningful in light of Twinlab's assertion that the introduction of the TruHerbs line was sufficient to offset a decline in sales of other products. Taken as a whole, then, the Court finds that the Plaintiffs have sufficiently alleged material misrepresentations by Twinlab sufficient to state a claim under the Securities Act.

### c. As to knowledge by Bear, Stearns and DLJ of the misrepresentations

■ Bear, Stearns and DLJ also argue that the Plaintiffs' Section 11 claims against them should be dismissed because the Plaintiffs have failed to allege facts showing that Bear, Stearns and DLJ had knowledge that the registration statement and prospectus contained misstatements. However, the defendant's knowledge of the misrepresentations is not an element of a Section 11 claim; indeed, a defendant can be held liable even for an innocent misstatement. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1251 (10th Cir. 1997), *citing Herman & MacLean*, 459 U.S. at 382, 103 S.Ct. 683; *In re Donald J. Trump Casino Securities Litigation*, 7 F.3d 357, 368 n. 10 (3d Cir.1993) ("[Section 10–b claimants] must plead not only that the defendants made material omissions and/or misrepresentations, but also that they reasonably relied on them and that the defendants acted with knowledge or recklessness ... §§ 11 and 12(2) impose no such requirements") (citations omitted).

### d. As to the pleading requirements of the Section 11 claim

■ Finally, the Defendants contend that the Plaintiffs should be held to the heightened pleading requirements of Rule 9(b) on their claims under Sections 11 and 12 of the Securities Act, because, although the claims do not specifically seek to allege fraudulent conduct, the nature of the allegations "clearly sound in fraud." *See e.g. In re American Bank Note Holographics, Inc.*, 93 F.Supp.2d 424, 439–440 (S.D.N.Y. 2000) (if plaintiff relies on the same facts to support both a Section 11 claim and

claim of fraudulent conduct under Section 10–b of the Exchange Act, both claims must be pleaded with Rule 9(b) particularity), citing In re Stac Electronics, 89 F.3d 1399, 1405 n. 2 (9th Cir.1996). While requiring Securities Act claims sounding in fraud to be pleaded under Rule 9(b) appears to be the prevailing position, see e.g. Ellison v. American Image Motor Co., 36 F.Supp.2d 628 (S.D.N.Y.1999), it receives something less than unanimous support. See Griffin v. PaineWebber Inc., 84 F.Supp.2d 508, 513 (S.D.N.Y.2000) (noting contrary cases).

This Court need not add its own voice to this chorus of disharmony. Even if the Plaintiffs were held to the strict pleading requirements of Rule 9(b), they have met its requirements. The Plaintiffs have specifically identified the statements alleged to be fraudulent, usually by quoting the offending language in the complaint. See e.g. Complaint ¶¶ 44, 50, 55, 62, 64, 67, 74, 82, 85, 89, 92, 96. After each reference to allegedly fraudulent language, the Plaintiffs identify the basis why that statement is allegedly false. Because these statements are contained in publicly filed reports, signed by the directors and officers of the company, the maker of each statement, while not specifically identified by the Plaintiffs, is readily discernable. Therefore, whether this Court requires ordinary notice pleading or the heightened standards of Rule 9(b), the Plaintiffs' complaint is sufficient to allege a violation of Section 11 of the Securities Act.

**2. As to the second cause of action under Section 12(a)(2) of the Securities Act**

Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, subjects "any person who offers to sell a security" by means of a misleading prospectus to liability, unless the seller can establish the affirmative defense that it did not know nor could have known of the misleading contents of the prospectus.

**a. Twinlab's status as "statutory seller"**

Twinlab contends that it cannot be held liable as a seller on the Section 12(a)(2) claim because the secondary offering took the form of a "firm commitment underwriting," in which Twinlab sold the shares to underwriters like Bear, Stearns and DLJ, who in turn sold the stock to the public. Twinlab argues that a lack of privity between itself and the underwriters insulates it from Section 12 liability. Citing Akerman v. Oryx Communications, Inc., 810 F.2d 336, 344 (2d Cir.1987). However, Twinlab's privity argument is substantially undercut by development of the law in this circuit following the Supreme Court's decision in Pinter v. Dahl, 486 U.S. 622, 644 n. 21, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).

Pinter established that collateral participants to a sale can still be liable under Section 12, even in the absence of privity with the actual seller, if the participant solicited the sales for financial gain. See Wilson v. Saintine Exploration and Drilling Corp., 872 F.2d 1124, 1126 (2d Cir. 1989); Capri v. Murphy, 856 F.2d 473, 478 (2d Cir.1988); Feiner v. SS&C Technologies, 47 F.Supp.2d 250, 254 (D.Conn.1999) ("Feiner II"). Thus, even in a "firm commitment underwriting" transaction, Twinlab could be held liable as a statutory seller if the Plaintiffs show that Twinlab (i) solicited sales of the company's stock; and (ii) did so motivated by financial gain. Milman v. Box Hill Systems Corp., 72 F.Supp.2d 220, 229–30 (S.D.N.Y.1999). The allegation of financial gain in the complaint—that Twinlab stood to gain more than $300 million in capital from the secondary offering—is clearly sufficient to meet the second prong. Milman, 72 F.Supp.2d at 230.

Moreover, the complaint contains sufficient allegations to suggest that Twinlab "solicited" sales of its stock. The complaint alleges that Twinlab "solicited the sale of Company shares through participating in the preparation of the materially

false and misleading Prospectus." Several cases within this circuit suggest that a party's mere participation in the preparation of a misleading prospectus is sufficient "solicitation" under Section 12(a)(2). *Capri*, 856 F.2d at 478 ("Murphy and GCC prepared and circulated the prospectus to plaintiffs, and that the prospectus omitted material facts which significantly affected the risk undertaken by the investors"); *American Bank Note*, 93 F.Supp.2d at 438 (complaint that alleged that defendant participated in "the preparation of the false and misleading Registration Statement and Prospectus and participating in 'road shows' to promote" the stock was sufficient to allege solicitation). At this early stage of the litigation, with all reasonable inferences drawn in the Plaintiffs' favor, the Court finds that the Plaintiffs have sufficiently alleged a claim against Twinlab under Section 12(a)(2).

### b. As to knowledge by Bear, Stearns and DLJ of the misleading statements

Bear, Stearns and DLJ also move to dismiss the Section 12(a)(2) claims against them, claiming that the Plaintiffs have failed to allege that Bear, Stearns and DLJ had knowledge that the statements in the prospectus were misleading.

This contention misallocates the burden of proof. Lack of knowledge of misleading statements in a prospectus is an affirmative defense to a claim under Section 12(a)(2) for which the *defendant* bears the burden of proof. 15 U.S.C. § 77*l*(a)(2) (any person liable under Section 12(a)(2) "who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission" shall be held liable); *In re Itel Securities Litigation*, 89 F.R.D. 104, 115 (N.D.Cal.1981) ("defendants can escape liability under the statute by proving the affirmative defense that the defendants did not know"). Bear, Stearns and DLJ have neither filed an answer asserting this defense, nor submitted affidavits in support of their motion claiming any lack of knowledge of the misrepresentations. Therefore, they have failed to carry their burden of proving lack of knowledge under Section 12(a)(2), and their motion to dismiss on this basis is denied without prejudice.

### 3. As to the fourth cause of action alleging fraud under Section 10–b of the Exchange Act

Plaintiffs' fourth cause of action alleges securities fraud under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 by the S.E.C., 17 C.F.R. § 240.10b–5, against Twinlab and its officers.

 To prove a violation of Section 10(b), a plaintiff must prove that the defendants, acting with scienter, made misrepresentations or omissions of material facts in connection with the purchase or sale of securities, and that the plaintiffs relied on such misrepresentations or omissions to their detriment. *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 207–08 (2d Cir.2000), *citing Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1494 (2d Cir.1992). The elements of a claim under Rule 10b–5 are essentially identical. *Id.; Press v. Chem. Invest. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999).

### a. As to the "motive and opportunity" standard

 In order to adequately plead the element of scienter, the Plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the intent to deceive, manipulate, or defraud. 15 U.S.C. § 78u–4(b)(2); *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 172 (2d Cir.1999); *Press v. Chemical Investment Services Corp.*, 166 F.3d 529, 538–39 (2d Cir.1999). At the pleading stage, this element can be satisfied by allegations that the defendants had both motive and opportunity to commit fraud, or facts that constitute strong circumstantial evidence of

conscious misbehavior or recklessness. *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000); *Press*, 166 F.3d at 539.

Several Defendants argue that the 1995 Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4, heightened the pleading requirements for scienter and abolished the "motive and opportunity" standard. *See e.g. In re Silicon Graphics*, 183 F.3d 970, 974 (9th Cir.1999); *In re Comshare, Inc.*, 183 F.3d 542, 549 (6th Cir.1999). This Court rejected such arguments in *In re Health Management*, 970 F.Supp. 192, 201 (E.D.N.Y.1997). The Second Circuit has repeatedly interpreted the PSLRA as continuing the "motive and opportunity" test. *See e.g. Novak*, 216 F.3d 300, 305; *Press*, 166 F.3d at 539; *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999). Accordingly, this Court sees no reason to depart from its ruling in *Health Management*, and holds that the Plaintiffs' complaint is sufficient if it alleges with particularity that the Defendants had the motive and opportunity to commit fraudulent acts.

 A party may demonstrate "motive" by showing "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 305; *Chill v. General Electric Co.*, 101 F.3d 263, 268 (2d Cir.1996). At a minimum, the alleged purpose must be in the informed economic self-interest of the defendant. *Shields*, 25 F.3d at 1130; *Schnell v. Conseco, Inc.*, 43 F.Supp.2d 438, 448 (S.D.N.Y. 1999). However, mere allegations that the defendant was motivated by a desire to simply maintain corporate profitability is not sufficiently concrete to meet the requirements of the PSLRA, *Chill*, 101 F.3d at 268, nor is an allegation that individual corporate officers simply sought to increase their own compensation by overstating performance. *In re Quintel Entertainment, Inc.*, 72 F.Supp.2d 283, 296

(S.D.N.Y.1999); *In re Fine Host Corp.*, 25 F.Supp.2d 61, 70 (D.Conn.1998).

### (i). As to motive and opportunity

 In essence, the Plaintiffs argue that Twinlab had two primary motives to make the fraudulent representations: (i) to inflate the stock price to maximize revenue from the secondary offering, so as to provide it capital to retire debt and complete a previously arranged corporate acquisition; and (ii) to maximize the value of Twinlab stock in the stock-for-stock trade with PR Nutrition, thus minimizing the actual number of Twinlab shares to be tendered.

The Court finds that these are sufficient allegations of motive, at least at the pleading stage. In *Duncan v. Pencer*, 1996 WL 19043 (S.D.N.Y.1996), the court held that a motive to "keep [the corporation]'s stock price high and complete two large public offerings" at prices above the company's actual book value was sufficient to meet the pleading requirements of scienter. *Duncan* relied upon *In re Time Warner, Inc.*, 9 F.3d 259, 270 (2d Cir.1993), in which the Second Circuit held that an allegation that the company artificially inflated its stock price, thus possibly allowing it to "rais[e] more capital by issuing the same number of shares," was a sufficient allegation of motive to survive a motion to dismiss. The motives alleged by the Plaintiffs here are essentially identical to those upheld in *Duncan* and *Time Warner*, and accordingly, the Court finds that the motives alleged by the Plaintiffs here are sufficient to allege scienter against Twinlab.

This conclusion is not inconsistent with this Court's previous ruling in *In re Health Management*, 970 F.Supp. 192, 204 (E.D.N.Y.1997). There, this Court dismissed Section 10(b) claims against two individual defendants who were allegedly motivated by desires to "allow ... [Health Management] to conclude various acquisitions by using the inflated value of its stock as merger consideration; and [to] obtain financing on behalf of ... [Health

Management] to pursue various business acquisitions." *Id.* Close review of *Health Management* reveals that this Court's holding was based on a finding that such motivations were not clearly in the *individual defendants'* economic self-interest. *Id.* ("The plaintiffs do not expressly or even inferentially explain how [these motivations are] in the informed economic self-interest of the *Individual Defendants.*") (emphasis added). By contrast, Health Management, Inc. had already been dismissed as a defendant on different grounds. 970 F.Supp. at 196. There is nothing inherently contradictory in finding that certain fraudulent activities advance a corporation's economic interests but do not necessarily advance the interests of the individual officers of the corporation. *See e.g. Duncan,* 1996 WL 19043 at *14 (finding the allegations of motive sufficient against the corporation but insufficient against the individual defendants).

Therefore, the Court finds that the Plaintiffs have alleged sufficient motives to defraud against Twinlab. However, based on the same rationale as *Health Management* and *Duncan,* the Court finds that the Plaintiffs have failed to adequately allege sufficient motive on behalf of the officers of Twinlab.

### (ii). As to conscious misbehavior or recklessness

Under the PSLRA, a plaintiff can also demonstrate scienter by proving that the defendants engaged in conscious misbehavior or made fraudulent statements with such an extreme departure from the standards of ordinary care that the danger was so obvious that the defendants must certainly have been aware of it. *Novak,* 216 F.3d at 307; *Health Management,* 970 F.Supp. at 202, *citing Chill,* 101 F.3d at 268. The facts alleged to support recklessness must be "strong circumstantial evidence" of that recklessness. *Chill,* 101 F.3d at 269. However, allegations of a violation of GAAP provisions or SEC regulations, without additional allegations of corresponding fraudulent intent, are not

sufficient to state a securities fraud claim. *Stevelman,* 174 F.3d at 85, *citing SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992).

 The complaint fails to allege sufficient facts to raise a strong inference that particular individual officers of Twinlab intentionally engaged in misconduct or acted recklessly. In fact, the complaint makes practically no reference to any individual officer of Twinlab in any of the factual allegations. The complaint consists simply of conclusory boilerplate allegations to the effect that "because of the individual officer defendants' positions with the Company," they should be held liable. Unlike a case like *Health Management,* there is no specific allegation in the complaint that the individual officers of Twinlab were present when the earnings management scheme was hatched, or that they necessarily approved the scheme. *Compare* 970 F.Supp. at 204. The bare allegations in the complaint here are insufficient to raise any inference of conscious misbehavior or recklessness, much less a *strong* inference. In sum, the complaint alleges violations of accounting principles and conclusory assertions that such violations were intentional. Because allegations of accounting violations, without more, are insufficient to state a claim, *Novak,* 216 F.3d at 308; *Stevelman,* 174 F.3d at 85, and the Plaintiffs have failed to allege with particularity any additional facts demonstrating the individual officers' intentions to violate GAAP, the Section 10(b) claims against Defendants Dean Blechman, Ross Blechman, and John McCusker must be dismissed for failure to state a claim.

3. **As to the third and fifth causes of action alleging control person liability under Section 15 of the Securities Act and Section 20 of the Exchange Act**

Section 15 of the Securities Act, 15 U.S.C. § 77*o,* provides that "any person

who ... controls" any entity that violates the Securities Act "shall be liable jointly and severally" for those violations, unless the control person lacked knowledge of the events giving rise to the liability. Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides that a person in control of an entity that violates the Exchange Act is jointly liable for such violations "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

■ In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) "that the controlling person was in some meaningful sense a culpable participant" in the primary violation. *Boguslavsky v. Kaplan*, 159 F.3d 715, 721 (2d Cir.1998). In this regard, the Court recognizes that *Boguslavsky*, which reiterates the requirement of culpable conduct, represents a clearer statement of the elements of a prima facie case of control person liability than existed at the time this Court decided in *Health Management* that allegations of culpable conduct were not required at the pleading stage. 970 F.Supp. at 206, *citing Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.), *cert. den.* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980) (culpable conduct not required to be pleaded for control person liability). Therefore, at least as it relates to the Plaintiffs' cause of action against Twinlab's officers as control persons under Section 20(a) of the Exchange Act, the Court holds that the complaint must allege facts demonstrating culpable conduct.

■ The complaint contains no such allegations. In the Fifth Cause of Action, the Plaintiffs allege that the individual officers of Twinlab had access to and knowledge of Twinlab's operational and financial information, and the ability to prevent the issuance of the statements alleged to be fraudulent. However, the Plaintiffs do not specifically allege facts demonstrating that the officers of Twinlab culpably participated in the scheme, rather than, for example, unknowingly approving credible but fraudulent financial reports prepared by subordinates. In the absence of facts demonstrating culpability, the Fifth Cause of Action alleging control person liability against Defendants Dean and Ross Blechman and John McCusker must be dismissed.

■ Generally, examination of control person liability under the Securities Act is governed by the same analysis as that used for control person liability under the Exchange Act. *Ellison v. American Image Motor Co.*, 36 F.Supp.2d 628, 638–39 (S.D.N.Y.1999). However, as discussed above, claims under Sections 11 and 12 of the Securities Act sound in strict liability and do not require knowledge by the defendants of the misrepresentations. Thus, the concept of culpability would not apply. Instead, to plead control person liability under the Securities Act, it is sufficient merely to demonstrate that the individual defendants controlled an entity that violated the securities laws. *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1315 (S.D.N.Y.1996). The SEC defines a control person as one having "the possession, direct[ly] or indirect[ly], of the power to direct or cause the direction of management and policies of a person, whether through the ownership of voting securities or otherwise." 17 C.F.R. § 240.12b–2; 17 C.F.R. § 230.405; *S.E.C. v. First Jersey Securities*, 101 F.3d 1450, 1472–73 (2d Cir. 1996).

■ The complaint is sufficient to allege control person liability against the individual defendants for the Securities Act violations. It is undisputed that Defendants Dean and Ross Blechman and John McCusker are officers of Twinlab, own substantial amounts of Twinlab stock, and that each exercised control over the allegedly misleading 10–Q reports, the prospectus, and other statements, including

affixing their signatures to these documents. These allegations are sufficient to allege control person liability under the Securities Act. *Degulis*, 928 F.Supp. at 1315. Similarly, Defendants Sandra Dunbar and John Danhakl are directors of Twinlab, and are alleged to hold substantial amounts of Twinlab stock, and signed the misleading 10–Q forms and prospectus. While director status alone is not sufficient to establish control, a director's position, coupled with that director's signature on a misleading filing has been held to be sufficient evidence of control. *In re Livent, Inc.*, 78 F.Supp.2d 194, 221–22 (S.D.N.Y. 1999) *citing Jacobs v. Coopers & Lybrand*, 1999 WL 101772 at *17 (S.D.N.Y.1999). Therefore, the allegations against Dunbar and Denhakl are sufficient to allege control person liability against these Defendants.

It appears from the complaint that the Plaintiffs also seek to assert their Securities Act control person claims against Defendants GEI and LGP. In essence, the complaint alleges that GEI and LGP control Twinlab simply by virtue of the fact that both partnerships own large blocks of Twinlab stock. This allegation does not carry the Plaintiffs far enough, however, as it fails to allege specifically that LGP and GEI's ownership, which even if combined constitutes a minority share of Twinlab stock, somehow allows them to exert control over the corporate. Since the Plaintiffs have not alleged how these partnerships, as distinct from Defendants Dunbar and Denhakl, exercised any "control" over any entity that violated the Securities Act, the Third Cause of Action against these Defendants is dismissed.

### CONCLUSION

For the foregoing reasons, the motion by Defendant Twinlab to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) is DENIED. The motion by Defendants Ross and Dean Blechman to dismiss the complaint pursuant to Rule 12(b)(6) is GRANTED to the extent they are named in the Fourth and Fifth causes of action,

but is DENIED in all other respects. The motion by Defendant John McCusker to dismiss the complaint pursuant to Rule 12(b)(6) is GRANTED to the extent that he is named as a Defendant in the Fourth and Fifth causes of action, but is DENIED in all other respects. The motion by Defendants Bear, Stearns and DLJ to dismiss the complaint pursuant to Rule 12(b)(6) is DENIED. The motion by Defendants Sandra Dunbar, John Denhakl, LGP, and GEI to dismiss the complaint pursuant to Rule 12(b)(6) is GRANTED to the extent that LGP and GEI are named in the Third cause of action, and is DENIED in all other respects.

**SO ORDERED**